No. 41.—THE ROME RAIL ROAD COMPANY, plaintiff in error, *vs.* SULLIVAN, CABOT & Co., defendants.

[1.] Where the party against whom the testimony is offered, is benefitted instead of injured by the failure of a witness to answer fully cross-interrogatories, it does not lie in his mouth to object to the reading of the evidence on account of the omission.

[2.] So if enough is stated to establish the point for which the proof is offered, the failure to answer more fully does not constitute a valid objection to the testimony.

[3.] All *misnomers* in *civil* suits may be amended instanter; and without working any delay to the party making the same.

[4.] Where any remark made by the Circuit Court will admit of two construc-

tions, the one against Law, and the other in conformity with it, the latter will be adopted.

[5.] Where goods are transported by a Rail Road Company, and upon their reaching the place of destination, stored at a ware-house, at the expense of the owner, without actual notice of their arrival, under a newspaper publication, that all articles not removed within a given time, will be thus disposed of: *Held*, that such erroneous delivery, notwithstanding it made the party chargable for all the loss and injury resulting therefrom, still it did not of itself amount to a *conversion* of the property; and that to maintain *trover*, a demand and denial were necessary.

[6.] If goods are not removed after notice of their arrival, within a reasonable time, the strict liability of a Rail Road Company, in their character of common carrier ceases; and they may charge storage themselves, or deposit the goods in the ware-house of another, at the risk and expense of the owner.

Trover in Floyd Superior Court.     Tried before Judge JOHN H. LUMPKIN, August Term, 1853.

The facts of this case are as follows: Messrs. Sullivan, Cabot & Co., merchants in Rome, had purchased in Augusta a quantity of rope, which was shipped on the Rome Rail Road, and arrived at the depot in Rome, Oct. 28th, 1852.

On the evening of the same day, the drayman of Sullivan, Cabot & Co. was taking the rope from the depot, and placing it on his dray; when Terhune, the Rail Road agent, directed him to put it back in the depot; giving as a reason, that the freight had not been paid. The next day Terhune sent the rope to the ware-house of Sloan, Cothrun & Co. In the afternoon of that day, the 29th, Hightower, the Clerk of Sullivan, Cabot & Co., called at the depot, and offered to the agent to pay the freight. The agent told him the goods were at the ware-house, and that he would find the freight bill there; and told him to go there and pay it.

Sullivan, Cabot & Co., then brought their action of trover for the rope, against the Rail Road Company; and on the trial, the above stated facts appeared in evidence.

During the progress of the trial, the interrogatories of Hightower were offered, to prove what had passed between him and the agent. Defendant objected to them, on the ground that

the cross-interrogatories were not answered in two points, to wit : whether or not he had demanded the rope of the agent ; and whether or not he had actually taken the money for the freight out of his pocket, and made a tender of it.

The Court overruled the objection, and defendant excepted.

A motion was made to non-suit the plaintiffs, because the action was brought against the *Rome Rail Road*, instead of the Rome Rail Road *Company*. The Court said " The case was, that the case made out, was against the Rome Rail Road Company, and he should permit the writ to be amended."

To which decision and remarks defendant excepted.

The defendant introduced testimony, that a notice had been published in the Rome papers, to the effect that the Company would send to the ware-house of Sloan, Cothrun & Co., all goods not taken away from the depot by 12 o'clock, on the day after their arrival.

The Court charged the jury that this notice availed the defendant nothing ; that their sending the rope to the ware-house, without actual notice to the owners of their arrival, was a conversion of the goods ; and that plaintiffs had a right to recover.

To which charge defendant excepted.

PRINTUP, for plaintiff in error.

UNDERWOOD, for defendant.

*By the Court.*—LUMPKIN, J., delivering the opinion.

[1.] The first exception in this case was to the testimony of Thomas J. Hightower ; and on the ground that he had not answered fully the cross-questions propounded to him in the interrogatories.

The object of this proof was to show a tender of the freight due for the transportation of the rope. And the objection to the evidence is two-fold. First. Because the witness did not state, as he was requested to do, whether or not he actually demanded the rope of Terhune, the agent of the road. The an-

swer to this is, that the omission is for the benefit of the defendant. For what does not legally appear, does not exist. If no demand is proven, none was made. This complaint, therefore, does not lie in the mouth of the party making it.

[2.] But Secondly, It is objected that Hightower, the plaintiff's witness, does not depose, as he was required to do, whether or not he actually took the money for the freight out of his pocket, and made a manual presentation of it. We hold that under the facts of the case, this formality was unnecessary ; and that taking the answers in the most unfavorable light for the plaintiff, still they establish a legal tender ; or what is equivalent to it. Hightower swears, that he called on Terhune, the agent of the Company, and offered to pay the freight on the goods; and had the money in his pocket for that purpose ; and that he declined receiving it, saying that the rope, as well as the freight bill had been forwarded to the ware-house of A. M. Sloan & Co. ; and that he had better call there and settle it. Any further tender was thus waived by the other party.

[3.] The next exception is to the refusal of the Court to award a non-suit upon the ground of a variance between the proof and the declaration. The action was brought against *The Rome Rail Road*, and the testimony established a cause of action against the Rome Rail Road *Company*. And instead of awarding a non-suit on account of this discrepancy, the Court allowed the writ to be amended instanter so as to correspond with the proof.

By reference to the Act of February, 1850, (*Pamphlet* 44) it will be seen that this practice was in strict and literal conformity with its provisions. It declares that *all misnomers* in writs on the *civil* side of the Courts, shall be corrected instanter, without working any delay to the party making the same.

[4.] And in this connection I had as well dispose of another exception ; and that is, that the presiding Judge, in refusing to grant the non-suit, expressed an opinion as to the sufficiency of the proof to support the suit, contrary to the prohibition in the Act of 1849.

Such is not our understanding of the remark which fell from

the Court, which was, that the case made out was against the Rome Rail Road *Company ;* (that is, if against any body) and not against the Rome Rail Road.

[5.] The next exception is to the charge of the Court; and this brings up the whole merits of this case.  His Honor instructed the jury that the newspaper notice, relied on by the Company, was not sufficient to justify their conduct.  It was to the effect, that they would send to the ware-house of Sloan, Cothran & Co., all goods not taken away from the depot by 12 o'clock on the day after their arrival.

It will be perceived that this is not even the ordinary notice which is usual in our large cities, that merchandize has been received at the Company's depots for such and such consignees, naming them.  It is a bare notification, that if the articles are not taken away within a given time after their arrival they will be sent to a ware-house and stored at the expense of the owner.— We are clear that such a proceeding is not only unjustifiable, but totally unavailable to protect the Company from liability.

A common carrier, and such is this Company, is bound not only safely to convey, but safely to deliver a parcel at the place to which it is directed.  Carriers are constantly endeavoring to narrow their responsibility, and to creep out of their duties.  And I am not singular in thinking that their endeavors ought not to be favored—especially at this day, when the public are left almost without option or election in selecting.

The Law applicable to common carriers is sufficiently rigorous; and I have no desire to enlarge the already heavy responsibility of those engaged in public transportation.  Yet there ought to be no vacillation in the decision of the Courts respecting principles founded in necessity, and in conformity with public policy.

Between Augusta and Rome, the transportation of merchandize and produce must be by the Rail Road, or not at all.  We hold that it was the duty of this Company to have given to owners and consignees *actual notice* of the arrival of goods, or to have shown such a usage as would warrant the presumption that contracts were made in reference to it.

[6.] Had notice been given of the arrival of the rope, and the owners had suffered it to remain an unreasonable time, the Company would have had the right to charge freight upon it themselves, or to have stored it elsewhere at the risk and expense of the owners. For this common carrier cannot be converted into a ware-houseman, without their consent and against their will. As to the nature and extent of the carrier's responsibility, if any there be, for goods or baggage remaining in their possession after their arrival at the place of destination, without fault or neglect on their part, we are not now required, nor indeed enabled, by this case, to settle. One thing, however, is very certain, and that is, that their strict liability as *carriers* ceases, under such circumstances: and that they retain possession as mere bailees in deposit, gratuitously or otherwise, according to usage, the course of business, or some legal principle applied to the special facts of the case. No general rule seems as yet to have been laid down, regulating and controlling such cases, although the principle, as applicable to them, will be found no doubt in the adjudications of the Courts or the Text Books.

But in this case there was no notice of any sort, either by publication in the newspapers, or otherwise. But under that, which I have quoted, and which was, not that certain goods had arrived at their depot, but that *all* goods left there, would be removed after a given time, the agent at the end of twenty-six hours, sent off the rope to the ware-house of Sloan & Co.— And it is worthy of remark, that the computation of time was very close in this case. The clock, or watch, must have been eyed vigilantly. (And Rail Road chronometers are not often *behind*-time.) The rope reached Rome between one and two o'clock on the 28th of the month (October) and was sent off between the hours of three and four the day following.— This haste is sought to be explained, on account of the crowded condition of the depot. And yet there seems to have been room enough for any other article but this nineteen coils of rope. It will be recollected too, that the drayman of Sullivan, Cabot & Co., on the evening of the same day when the rope

arrived, was in the act of taking it from the depot, when Terhune the agent, directed him to put it back, giving as a reason, that the freight had not been paid; when it is admitted that the house was perfectly solvent, and further that Hightower called the afternoon of the second day to pay the freight, but found the rope removed already.

I am constrained to say, that these facts manifest a degree of captiousness unbecoming any public or private employee, from the Chief Magistrate of the Union, down to the lowest grades of agents in the service of our Rail Roads and other corporations.   The people have a right to expect and demand kindness, civility, and a becoming consideration for their rights and feelings from all with whom they are compelled to transact business.

[4.] But the inquiry now arises, do the facts of this case amount to a *conversion* of this property ?   The Circuit Court held that they did.

It is not insisted that Hightower demanded the rope of Terhune, when he called to pay the freight.   The position assumed is, that the defendant having delivered the rope to a wrong person, namely, the ware-houseman, that this was in law a conversion.

This point is not without difficulty, for it is certainly true that if a common carrier deliver goods to a wrong person, although done even by an innocent mistake on his part, or by his being imposed upon, he will not only be liable to the true owner for the whole value of the goods ; but such wrongful delivery is in the Common Law, treated as a conversion of the property. (*Stephenson vs. Hart*, 4 *Bing. R.* 470.   *Duff vs. Budd*, 3 *Brod. & Bing.* 177.   *Youle vs. Harbottle*, *Peake R.* 68. *Devereux vs. Barclay*, 2 *Barn. & Ald.* 702.   *Stephens vs. Elwell*, 4 *M. & Selw.* 259.   *Story on Bailments*, § 450, 543, 570.   *Powers vs. Myers*, 26 *Wend. R.* 591, 595.)

But this contemplates a case where the possession of the goods had passed out of the true owner into the hands of another claiming them as his own.

The strongest reported case to be found in the Books in fa-

vor of the plaintiff below, is *Syeds vs. Hay,* 5 *Term. Rep.* 260, (*bottom Paging.*)

There the Captain of a Vessel in which goods had been shipped, left them in the hands of a wharfinger for the plaintiff's use; and he might have had them at any time by sending there and paying the wharfage. The Captain acted under the idea of the wharfinger's having a lien on the goods for the wharfage fees, because the vessel unloaded against the wharf. *Trover* was brought by the owner against the Captain of the Vessel for the goods; and the only question was, whether there was evidence of a *conversion* to maintain the action.

Lord Kenyon, on the trial, was of the opinion, that as the Captain acted from an impression that the wharfinger had the right for wharfage fees, according to the usage of the port, there was no conversion; and especially *as the goods had been delivered to the wharfinger for the use of the defendant;* and that the proper remedy was by action *on the case.* The cause was nevertheless permitted to proceed, reserving the point for the consideration of the Court.

The verdict was rendered for the plaintiff, and upon a rule to show cause why it should not be set aside, and a non-suit entered, the Judges in Banc held, that as the wharfage was not due, and so the jury had found, that it was clear that *Trover* would lie against the defendant.

*Buller* Justice, in delivering his opinion, laid much stress upon the circumstance that previous to the landing of the goods, the plaintiff intending to convey them from the vessel himself, expressly directed the defendant not to land them on the wharf. And on this account, he thought the case distinguishable from that of a misdelivery of goods, merely owing to a mistake.

But the fundamental difference between this case and the one at bar, is this: In the English case *there was a demand and refusal.* This is expressly stated in the Head Notes, and conceded in the argument of counsel, both for and against the rule. Here it is admitted there was none. Had Hightower, the Clerk of the Plaintiffs demanded the rope, when he called to discharge the freight, we should not hesitate to maintain the

action, because the Rail Road had no right to bring the additional charge upon the owners, by storing their goods in a ware-house, without having first given them notice of their arrival. Sloan, Cothran & Co. were not the agents of Sullivan, Cabot & Co. Trover could have been brought against *them* for the rope had they failed to deliver it upon demand.

While we hold then, that the defendants were chargeable for all the loss and injury resulting from the misdelivery of this rope, and that the delivery to the ware-houseman was a misdelivery, yet our judgment is, that a demand was necessary, before Trover would lie to recover the goods. And this conclusion will be found to be supported by the better, if not by the uniform authority of the Courts, and the Books.

Judgment reversed.